14 CV 9760

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
Laurence M. Rosen, Esq. (LR 5733)
Email: lrosen@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel:    (212) 686-1060
Fax:    (212) 202-3827

Counsel for Plaintiff



RECEIVED
DEC 10 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEN NGO, Individually And On Behalf Of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>vs.<br><br>PETROLEO BRASILEIRO S.A. - PETROBRAS,<br><br>        Defendant. | Case No.:<br><br><u>CLASS ACTION</u><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Ken Ngo ("Plaintiff"), individually and on behalf of all other "'persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiffs allegations are based on the investigation conducted by Plaintiff's undersigned attorneys, which included, among other things: (a) a review and analysis of Petroleo Brasileiro S.A. - Petrobras ("Petrobras" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases, public statements, and other publicly available information

1

disseminated by, or concerning, Petrobras and related parties; and (c) a review and analysis of Petrobras's press conferences, analyst conference calls, conferences, presentations, and corporate website.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities who purchased American Depoistary Shares ("ADSs") of Petrobas on a United States exchange, from May 20, 2010 through November 21, 2014, inclusive (the "Class Period").

2.      Petrobras explores for, and produces, oil and natural gas. The Company refines, markets, and supplies oil products. Petrobras operates oil tankers, distribution pipelines, marine, river and lake terminals, thermal power plants, fertilizer plants and petrochemical units.

3.      During the Class Period, Defendant made materially false and misleading statements by misrepresenting facts and failing to disclose a multi-year, multi-billion dollar money-laundering and bribery scheme. Specifically, Petrobras's senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies such as Odebrecht S.A. ("Odebrecht") and SBM Offshore NV ("SBM") that were awarded the contracts illegally. These illegal acts caused the Company to overstate its property, plant and equipment line item on its balance sheet because the overstated amounts paid on inflated third party contracts were carried as assets on the balance sheet.

4.      In addition, this illegal bribery and kickback scheme further violated representations Petrobras made to its investors concerning the Company's own anti-corruption and anti-bribery practices under its Code of Ethics. During the Class Period, Petrobras filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Petrobras's internal controls and procedures. Petrobras consistently

represented that the "Company identified no change in its internal controls over financial reporting."

5.       Further, during the Class Period, the Company's Chief Executive Officers, Jose Sergio Gabrielli de Azevedo ("Azevedo") and Maria das Gracas Silva Foster ("Foster"), and its Chief Financial Officer, acting on behalf of Petrobras, signed certifications pursuant to the Sarbanes-Oxley Act of 2002. Those certifications contained false and misleading representations that Petrobras had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

6.       Foster was the Company's Chief Gas and Power Officer from September 21, 2007 through January 2012. Since February 2012, Foster has been the Company's Chief Executive Officer. Since July 2012, Foster has been the Company's Chief International Officer. Foster has been a member of the Company's Board of Directors since February 2012.

7.       According to various media reports, Petrobras's top executives, including Paulo Roberto Costa ("Costa") and Renato de Souza Duque ("Duque"), were principal executives in the money laundering and bribery scheme that has been estimated to total 10 billion Brazilian reais or approximately $4.4 billion. Costa was a member of Petrobras's senior management as the Company's Chief Downstream Officer from May 14, 2004 through April 2012. As the Chief Downstream Officer, Costa was the top executive in charge of Petrobras's refining division. As such, Costa was intimately aware and had knowledge of the needs of the Company's refineries, including the state of current and future contracts. Duque was also a member of Petrobras's senior management as the Company's Chief Services Officer from January 31, 2003 through February 2012. As the Chief Services Officer, Duque was in charge of Petrobras's engineering

and services division and worked closely with the Company's refining division. Duque's engineering division was co-responsible for Abreu e Lima contracts.

8.      Costa and Duque were senior officers of Petrobras and their knowledge and active participation in the scheme are attributable to Petrobras. Costa and Duque had the power to bind Petrobras to the inflated contracts, and as senior officers of Petrobras, they routinely recommended such contracts to Petrobras's executive board for approval. According to Costa's testimony, which was released by a Brazilian federal court, Costa admitted that for, at least, seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves." Odebrecht is one of those contractors that has been specifically named by Costa. Odebrecht's offices were subsequently searched, and documents were seized that concerned Odebrecht grossly overbilling Petrobras in an $835 million contract.  SBM, another contractor of Petrobras, has admitted to bribing individuals related to Petrobras in an amount in excess of $139 million, and has been fined by Dutch authorities for improper payments to sales agents in several countries including Brazil from 2007 through 2011.

9.      Besides Petrobras's top executives, the illegal bribery and kickback scheme also involved politicians and a group of, at least, 16 contractors who formed a cartel that assured that its members of the cartel would win Petrobras's major contracts including ones related to an oil refinery called "Pasadena" located in Texas and the Abreu e Lima refinery ("RNEST") located in Pernambuco, Brazil. According to Brazilian prosecutors and the Brazilian Federal Police, Costa granted contracts to these "Brazilian construction companies that systemically inflated their costs by as much as 20%." After winning the contracts, "the construction companies kicked back up

to 3% of a contract's total value in the form of bribes to Mr. Costa, Brazilian politicians and money launderers" from the profits received from the inflated contracts.

10.    As of November 14, 2014, the Brazilian Federal Police, under Operation "Car Wash", has arrested at least 24 suspects in connection with the money laundering and bribery scheme, including Alberto Youssef ("Youssef"), a black market money launderer. Youssef was considered to be the scheme operator and has been promised of reduced sentences by Brazilian prosecutors in exchange for his cooperation. Youssef testified that the bribery scheme was rampant throughout Petrobras and its subsidiaries, and that each subsidiary's board split the bribery money with its respective politicians.

11.    Through a series of revelations including  the arrests of Costa and Duque and admission that the Company may have to adjust its historical financial statements to recognize the difference in overpricing its construction contracts, the closing price of Petrobras's ADSs have declined from a $19.38 per ADS on September 5, 2014 to $10.50 per ADS on November24, 2014, representing a decline of $8.88 per ADS or 46%.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) of  the Exchange Act, (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C.  § 78aa and 28 U.S.C.  § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. Among other things, Petrobras's ADSs are listed on the NYSE, which is

located within this District, and Petrobras has an office at 570 Lexington Avenue, 43rd Floor, New York, NY 10022

15.     Petrobras is not immune from suit in the United States under the Foreign Sovereign Immunities Act ("FSIA") as Petrobras engages in commercial activity, both in the United States and elsewhere having a direct effect in the United States. *See* 28 U.S.C.   § 1605(a)(2)

16.     Petrobras has continuous and systematic contacts with the United States and is doing business within Texas, New York and elsewhere in the United States. Petrobras produces oil and gas with refinery operations in the United States. Petrobras owns Pasadena Refining System Inc. ("PRSI"), headquartered in Pasadena, Texas and 100% of PRSI's related trading company - PRSI Trading, LLC. PRSI Trading, LLC is a Domestic Limited Liability Company located in Texas.

17.     Petrobras has sufficient minimum contacts within New York to make the exercise of jurisdiction over it by the federal courts in New York consistent with traditional notions of fair play and substantial justice. Defendant Petrobras transacts business, has an agent, and/or is found within New York, and the unlawful conduct alleged in this complaint had effects in New York.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Petrobras, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

**PARTIES**

19.     Plaintiff K e n   N g o , a resident of Illinois, purchased Petrobras's ADSs, in reliance on Defendant's materially false and misleading statements and omissions of material facts and the integrity of the market for Petrobras's ADSs at artificially inflated prices during the Class Period, and was damaged when the truth about Petrobras, that was misrepresented and omitted during the Class Period, was revealed to the market. The certification of Peter Kaltman, with a listing of his transactions in Petrobras's ADSs during the Class Period, is annexed hereto.

20.     Petrobras is an integrated oil and gas company that is the largest corporation in Brazil, in terms of revenue. The Company operates nearly all of the refining capacity in Brazil. As of December 31, 2013, the Brazilian federal government owned 28.67% of Petrobras outstanding capital stock and 50.26% of its common shares and is the controlling shareholder of Petrobras. Petrobras is incorporated in Brazil and its ADSs are listed on the NYSE under the symbol "PBR." The Company also operates in 17 other countries, including the United States where it produces oil and gas and has refining operations. Petrobras has an office at  570 Lexington Avenue, 43rd Floor, New York, NY 10022. Petrobras America Inc. is located at 10350 Richmond Avenue, Suite 1400, Houston, Texas 77042.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Petrobras's ADSs during the Class Period and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, approximately 768 million Petrobras ADSs were outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Petrobras or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)     whether Section 10(b) the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, were violated by Defendant's acts as alleged herein;

b)     whether Petrobras's filings with the SEC, including its quarter-end and year-end reports, the documents referenced therein, and/or subsequent public statements by Defendant and senior executives on behalf of Petrobras were materially false or misleading;

     c)      whether Petrobras acted with scienter  m m·is representing and/or omitting to state material facts

     d)      whether the market price of Petrobras's ADSs was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein; and

     e)      to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

     26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Form 20-F for Year Ended December 31, 2009**

     27.     On May 20, 2010, the Company filed its annual report for the year ended December 31, 2009 on a Form 20-F with the SEC (the "2009 20-F"). The 2009 20-F was signed by Jose Sergio Gabrielli de Azevedo ("Azevedo"), the Company's then CEO, and Almir Guilherme Barbassa ("Barbassa"), the Company's Chief Financial Officer and Chief Investor Relations Officer. The Form 20-F stated the Company's financial results and financial position. In addition, the 2009 Form 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Azevedo and Barbassa. The SOX certifications stated that the financial information contained i n the 2009 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2009 20-F did "not contain any untrue statement of a material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Azevedo and Barbassa have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." Azevedo and Barbassa's statements were attributable to the Company.

28.    In addition, the 2009 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2009, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

29.    The 2009 20-F incorporated the Petrobras Code of Ethics ("Code"), available on the Company's corporate website and stated that the Code "is applicable to all employees, the board of executive officers and the board of directors." The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."

30.    These statements were materially misleading because the money laundering and bribery scheme that was ongoing in 2009 was in blatant violation of the Code, which expressly stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

31.     The 2009 20-F also represented that the Company's assets under property, plant and equipment ("PP&E") were worth $136.2 billion at the end of 2009. Further, the Form 2009 20-F represented that under the Company's PP&E, "costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the 'successful efforts' method," which required that costs incurred "in connection with the drilling of developmental wells and facilities in proved reserve production areas and successful exploratory wells be capitalized." These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

32.     The 2009 20-F also stated that:

> Odebrecht, Petrobras, Petroquisa and Braskem executed an agreement, seeking to regulate their commercial and corporate relationship in the Petrochemical Complex of the State of Rio de Janeiro (COMPERJ) and in the Petrochemical Complex of Suape (Suape Complex)....These transactions are in alignment with the interests of Odebrecht and Petrobras to integrate their petrochemical business s in Braskem..

33.     This statement was false and misleading because Petrobras failed to disclose to the market .that the Company's executives, including Costa and Duque, were inflating construction contracts and awarding them to a cartel of selected construction companies, including Odebrecht and SBM, after receiving significant bribes.

**Form 20-F for Year Ended December 31, 2010**

34.     On May 26, 2011, the Company filed an annual report for the year ended December 31, 2010 on a Form 20-F with the SEC (the "2010 20-F"), which was signed by Azevedo arid Barbassa, and stated the Company's financial results and financial position. The 2010 20-F contained signed certifications pursuant to SOX by Azevedo and Barbassa, stating that

the financial information contained in the Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2010 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Azevedo and Barbassa hae disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control' over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." These statements by Azevedo and Barbassa were attributable to the Company.

35.     In addition, the 2010 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

36.     The 2010 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, and the members of the board of executive officers and the· board of directors." The 2010 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."

37.     These statements were materially misleading because the money laundering and bribery scheme ongoing in 2010 was in violation of the Code, which stated that the Company's

employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions.

38.     The 2010 20-F represented that the Company "invested a total 'of U.S. $6,681 million in our refineries" and its PP&E amounted to $218.6 billion at the end of 2010.  Further, the Form 20-F presented that under the Company's PP&E, "costs incurred in connection with the exploration, development and production of oil and gas are recorded in accordance with the successful efforts' method," where "costs are accumulated on a field-by-field basis with certain exploratory expenditures and exploratory dry holes being expensed as incurred."  These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E and investments in refineries were adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

39.     The Company failed to disclose to the market that the Company's senior executives who had the ability to bind the Company to multi-billion dollar contracts were active participants in the money laundering and bribery scheme. Specifically, senior executives such as Costa and Duque were signing off on the inflated construction contracts and recommending them to Petrobras's executive boards for approval. In essence, through their senior positions in the Company, Costa and Duque had the authority to award the inflated construction contracts to a select group ·of construction companies including Odebrecht after receiving significant bribes, and as a result, the Company falsely represented that Petrobras's transaction with Odebrecht "are in alignment with the interests of Odebrecht and Petrobras.

**Form 20-F for Year Ended December 31, 2011**

40.     On April 2, 2012, the Company filed an annual report for the year ended December 31, 2011 on a Form 20-F with the SEC (the "2011 20-F"), which was signed by

Case 1:14-cv-09760-UA   Document 1   Filed 12/10/14   Page 14 of 39

Barbassa and Foster, and stated the Company's financial results and financial position. In addition, the 2011 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Barbassa and Foster have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." These certifications are attributable to the Company.

41.     In addition, the 2011 20-F stated that the management of the "Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

42.     The 2011 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, and the members of the board of executive officers and the board of directors. The 2011 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the

14

creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."

43.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2011 was in violation of the Code, which stated that the Company 's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control  and consequences of any transgressions."

44.     The 2011 20-F represented that the Company's PP&E amounted to $182.5 billion at the end of 2011 and the Company "invested a total of U.S. $5,618.75 million in our refineries, of which U.S. $1,208.89 million was invested for hydro treating units to improve the quality of our diesel and gasoline and U.S. $1,039.19 million for coking units to convert heavy oil into lighter products." The Company represented that the "most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, and power , plants." Also, the Form 20-F represented that under the Company's PP&E, "costs incurred in connection with the exploration, development and production of oil and gas are accounted for in accordance with the successful efforts method" which required "that capitalization of costs incurred in connection with the development of proved reserve areas and successful exploratory wells." Further, the 2011 20-F represented, unlike prior Form 20-Fs, that PP&E is measured "at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

45.     These statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E and investments in refineries were adversely

impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations

**Form 20-F for Year Ended December 31, 2012**

46.     On April 29, 2013, the Company filed an annual report for the year ended December 31, 2012 on a Form 20-F with the SEC (the "2012 20-F"), which was signed by Barbassa and Foster, and stated the Company's financial results and financial position. In addition, the 2012 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, and stated that the financial information contained in the Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial rep01ling. Specifically, the certifications represented that the 2012 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Barbassa and Foster have disclosed "[all] significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant *role* in the Company's internal control over financial reporting."

47.     In addition, the 2012 20-F stated that the management "has not identified any change in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

48.     The 2012 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to all employees, executive officers and the board of directors." The 2012 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" which is "responsible for promoting corporate compliance with ethical principles."

49.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2012 was in violation of the Code, which stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

50.     The 2012 20-F represented that the Company's PP&E amounted to $204.9 billion at the end of 2012 and the Company "invested a total of U.S. $3,435 million in our refineries, of which U.S. $2,581 million was invested for hydrotreating units to improve the quality of our diesel and gasoline and U.S. $419 million for coking units to convert heavy oil into lighter products." The Company also represented that the "most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, and power plants."

51.     Further, the 2012 20-F represented that PP&E "are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses." Also, the 2012 20-F represented that "costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting" which includes the "[c]osts related to the construction,

installation and completion of infrastructure facilities, such as platforms, pipelines, drilling of development wells and other related costs incurred in connection with the development of proved reserve areas and successful exploratory wells are capitalized within property, plant and equipment."

52.     These statements were false and misleading because the Company failed to disclose that the true value of the Company's PP&E and investments in refineries were adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

**Form 20-F for Year Ended December 31, 2013**

53.     On April 30, 2014, after the market closed, the Company filed an annual report for the year ended December 31,"2013 on a Form 20-F with the SEC (the "2013 20-F"), which was signed by Barbassa and Foster, and reiterated the Company's previously announced financial results and financial position. In addition, the 2013 20-F contained signed certification  pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the Form 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Foster and Barbassa have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.".

54.     In addition, the 2013 20-F stated that the management "has not identified any change in its internal control over financial reporting during the fiscal year ended December 31, 2013, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

55.     The 2013 20-F incorporated the Code, available on the Company's corporate website and stated that the Code "is applicable to our workforce, executive offices and the board of directors." The 2012 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" which is "responsible for promoting corporate compliance with ethical principles."

56.     These statements were materially false and misleading because the money laundering and bribery scheme that was ongoing in 2013 was in violation of the Code, which stated that the Company's employees, executive officers and members of the board of directors were to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."

57.     The 2013 20-F represented that the Company's PP&E amounted to $227.9 billion at the end of 2013 and the Company "invested a total of U.S. $3,162 million in our refineries, of which U.S. $2,512 million was invested for hydro treating units to improve the quality of our diesel and gasoline and U.S. $174 million for coking units to convert heavy oil into lighter products." The Company also represented that the "most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, power plants as well as fertilizers and biodiesels plants."

58.     Further, the 2013 20-F represented that PP&E "are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use,

adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses." Also, the 2013 20-F represented that "costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting" which includes the "[c]osts related to the construction, installation and completion of infrastructure facilities, such as platforms, pipelines, drilling of development wells and other related costs incurred in connection with the development of proved reserve areas and successful exploratory wells are capitalized within property, plant and equipment."

59.     These statements were false and misleading because the Company failed to disclose that the true value of the Company's PP&E and investments in refineries were adversely impacted by illegal activities that inflated the value of numerous construction contracts related to Petrobras's refineries and operations.

60.     The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate ourr compliance with applicable regulations" and the "scope of each internal commission is established by our management." Significantly, the 2013 20-F represented that on "March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

**The Congressional Hearing**

61.     On May 27, 2014, fifteen days before Foster testified on June 11, 2014 before a congressional investigation committee, the Comissao Parlamentar de Inquerito ("CPI"), Petrobras received a letter from SBM warning the Company that Netherland's Public Ministry was inquiring into bribery payments by SBM to Petrobras's employees Notwithstanding that knowledge, Foster falsely represented to the CPI and to the investing public in her testimony on June 11, 2014, that no

irregularities were discovered, even though "she knew about several evidences of irregularities" prior to her testimony on June 11, 2014.

62.     The statements referenced in ¶¶ 27-29; 31-32; 34-36; 38; 40-42; 44; 46-48; 50-51; 53-55; 57-58; and 60-61 above were materially false and/or misleading because Petrobras misrepresented and failed to disclose the following adverse facts, which were known to Petrobras and its senior executives, including Costa and Duque, or recklessly disregarded by them, including that: (i) the Company was overcharging its property, plants and equipment on its balance sheet by overpricing contracts to certain companies relating to its refineries and operations and accepting kickbacks from construction companies approved for those contracts; (ii) the Company was receiving multi-billion dollar bribes from third party contractors to secure contracts from Petrobras; (iii) the Company was in violation of its own Code of Ethics as its employees and executives were routinely accepting bribes from certain construction companies; (iv) the Company's internal controls were ineffective and deficient; and (v) the Company was aware of irregularities in connection with bribes from third party contractors as Foster had knowledge that Netherland's Public Ministry was inquiring into bribery payments by SBM to Petrobras's employees.

**TRUTH BEGINS TO EMERGE**

63.     By September 7, 2014, certain facts with respect to the corruption at Petrobras became publicly known by virtue of Costa's arrest and a Brazilian criminal investigation. Indeed, on September 7, 2014, after the market closed, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election." The article cites a Brazilian magazine, Veja, which reported that Costa revealed "a group of politicians, including members and allies of Rousseff s Workers' Party" had accepted bribes linked to Petrobras contracts.

64.     On the news that the bribes paid to Brazilian politicians had been linked to Petrobras contracts, Petrobras's ADSs declined $1.03 per ADS or more than 5%, to close at $18.35 per ADS on September 8, 2014.

65.     On September 8, 2014, after the market closed, Petrobras acknowledged the corruption at the Company by issuing a statement concerning Costa's arrest and the federal criminal investigation. Specifically, Petrobras stated in relevant part, stated:

> It is in the best interests of the company's management to see the completion of all ongoing Investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company employees, do not represent the conduct of the Petrobras institution and its workforce.

66.     On this statement by the Company, acknowledging the corruption, Petrobras's ADSs declined $0.52 per ADS or nearly 3%, to close at $17.83 per ADS on September 9, 2014.

67.     On September 30, 2014, after the market closed, *Bloomberg News* published an article stating that Duque "stamped and signed at least 6.6 billion Brazilian reais ($2.7 billion) in contracts for the Abreu e Lima refinery" and recommended to Petrobras's executive board to approve the over-billed contracts in late 2009. Further, Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed.

68.     On this news, Petrobras's ADSs declined $0.89 per ADS or more than 6%, to close at $13.30 per ADS on October 1, 2014.

69.     On October 9, 2014, after the market closed, the Brazilian federal court released Costa's testimony: Costa testified that kickbacks were paid to members of the Workers' Party, the political party of the President of Brazil, Dilma Rousseff ("Rousseff"). According to an article by *The Wall Street Journal*, Costa "alleged that a certain percentage of contracts at the refining unit of Petrobras were to go to members of the Workers' Party."

70.     The release of Costa's testimony by the Brazilian federal court, as independently confirmed by TheStreet caused Petrobras's ADSs to decline $1.15 per ADS or nearly 7%, closing at $15.62 per ADS on October 10, 2014.

71.     On October 16, 2014, before the market opened, the Federal Court of Accounts ("TCU") published a report concluding that Petrobras will spend 60 percent more than originally budgeted at one of its refineries. Specifically, the TCU concluded that Petrobras will pay $21.6 billion to complete the Complexo Petroquimico do Rio de Janeiro ("Comperj") complex. Comperj is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010 and is scheduled to start up on 2015. The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investments 'needed for' Comperj." Moreover, the TCU concluded that Petrobras's management had been "'reckless' with irregularities in the omission of technical analyses, overpaying ' for contracts and a lack of effective controls." One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way." The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

72.     On the release of the TCU's report, Petrobras's ADSs declined $1.05 per ADS or nearly 7%, to close at $14.50 per ADS on October 16, 2014.

73.     On Saturday, October 18, 2014, during a news conference during the day, Rousseff admitted that there was embezzlement of public money in Petrobras and that the Brazilian government would seek reimbursement of any money illegally diverted from the Company.

74.     As a result of the admission by Rousseff of embezzlement in the Company, Petrobras's ADSs declined $0.93 per ADS or more than 6%, to close at $14.00 per ADS on October 20, 2014.

75.     On October 20, 2014, after the market closed, *Bloomberg News* published a detailed article about the money laundering and bribery' scheme. The article noted that Costa had admitted to investigators through his testimony on October 8, 2014, that for, at least, seven years, he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves." The article further stated that Costa had admitted that he personally received tens of millions of dollars and called the bribes from the companies a "'three percent political adjustment.'" Costa named several construction companies that was part of the cartel including Odebrecht and Camargo CorreaS.A.

76.     The article continued that, as part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud, overpricing and kickbacks" in, at least, seven contracts, including one contract for a 3.4 billion Brazilian reais coking unit and another contract for a 3.19 billion Brazilian reais hydro-treater and related units. The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian reais. Indeed, according to federal court documents reviewed by *Bloomberg News*, Costa and Duque signed off on the coking unit and hydro-teater contracts and then sent them to Petrobras's executive board where they were approved. Moreover, in response to Costa implicating Duque in the bribery investigation related to RNEST, Duque responded that the "final decision on all contracts is made collectively by directors and the CEO."

77.     The article also noted that Costa had implicated Youssef for creating fake import companies to launder the kickbacks. Consequently, Youssef had revealed to prosecutors and police in his own testimony "how he laundered money overseas from overpriced Petrobras contracts and how he distributed money from construction companies, in cash, to politicians."

78.     As a result of the revelations in the article by *Bloomberg News*, Petrobras's ADSs declined $0.80 per ADS or nearly 6%, to close at $13.20 per ADS on October 21, 2014.

79.     On October 27, 2014, before the market opened, the Company revealed that it had set up Internal Investigative Committees "to examine evidence or facts perpetrated against the company, as well as to assist administrative measures and resulting procedures."

80.     On the disclosure of the creation of Internal Investigative Committees, Petrobras's ADSs declined $1.77 per ADS or nearly 14%, to close at $11.16 per ADS on October 27, 2014.

81.     On Saturday, November 1, 2014, the Brazilian newspaper, *O Estado de Sao Paulo*, reported that Petrobras's auditor, PricewaterhouseCoopers ("PwC") had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations. Specifically, PwC refused to sign off on the financial results for one of Petrobras's subsidiaries, Transpetro as they were signed by Sergio Machado ("Machado"), the Petrobras executive implicated by Costa. PwC urged the Company to take action to dismiss Machado. On November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence to curb PwC's protest.

82.     The news that PwC refused to sign off on the Company's third quarter financial results, as independently confirmed by a news article, caused Petrobras's ADSs to decline $0.44 per ADS or nearly 4%, to close at $11.26 per ADS on Monday, November 3, 2014.

83.     On Sunday, November 9, 2014, *The Financial Times* reported that the U.S. Department of Justice ("DOJ") had opened a criminal investigation on whether Petrobras or

its employees were paid bribes and that the SEC had opened a civil investigation into the matter. Specifically, *The Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.

84.    On the reporting by various media outlets that the DOJ and SEC had opened separate investigations into the bribery scandal, Petrobras's ADSs declined $0.28 per ADS or 2.5%, to close at $10.62 per ADS on November 10, 2014.

85.    On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company's financial statements." As a result, the Company delayed releasing the financial statements for the third quarter 2014 as it needs additional time to:

> (i)      deeply analyze the investigatfon in course; (ii) adjust the Company based on the allegations of "Operacao Lava Jato;" and (iii) evaluate the need of improving govcmance control, the Company isn't ready to publish its bala nce sheet regarding the third quaiIer of 2014 on this date.

86.    On November 14, 2014, it was reported in various media outlets during the day, that the Brazilian. Police issued 27 arrest w arr ants and, arrested 18 individuals including Duque and Erton Medeiros Fonseca ("'Fonseca"), a director of engineering and infrastructure at Galvao Engenharia S.A. Also, one of Petrobras's contractors, Odebrecht, confirmed that "its offices in Rio de Janeiro had been searched and documents seized."

87.    On the news of the arrests, Petrobras's ADSs declined $0.25 per ADS or nearly 2.5%, to close at $9.95 per ADS on November 14, 2014.

88.    On November 17, 2014, before the market opened, the Company had a conference call to discuss its third quarter 2014 guidance. During the call, Foster noted that if Costa's

accusations are true, they could potentially affect and "may lead to possible adjustment in the financial statements of" Petrobras. Foster revealed that the Company had been implementing "governance and management processes between 2012 and 2014." Accordingly, the Company's board of directors approved the creation of a compliance department.

89.     During the Q&A session, an analyst asked assuming the •'accusations of surcharge or overcharge are confirmed," what kind of accounting adjustments would need to be made in the Company's financial statements and what main line items would be impacted assuming "BRL 5 billion were overpriced in the construction of RNEST." Barbassa replied that the adjustments would be to the fair price of PP&E. If the allegations are true, Barbassa said there would be an "overpayment, payment above what would be a fair value for a good or service. In this case, this value should be removed from PP&E line item, invested value and should be taken to the results.,; In determining fair value, Barbassa elaborated that the Company would need to deduct for PP&E "the amount that could be linked to bribery of any sort, any accepted price that would have been charged."

90.     Later in the day, Foster confirmed that SBM bribed Petrobras employees to win contracts. Foster stated that due to the "overwhelming evidence of noncompliance," SBM "will no longer be' eligible to bid for further contracts with Petrobras."[34] Moreover, Foster admitted the following: "We [were]'informed in the' past that we had identified no irregularities at this niatter. After a- few weeks or month, l was informed that there were indeed bribes to employees or forrier. efriployees of Petrobras." Jose Formigli, Petrobras's Head of Exploration and Production, also revealed the following:

> The CEO eceived a call anci a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands. This is

27

overwhelming evidence outright – it's the company's own admission that it was aware of [the bribery].

91.     As a result of the Company's conference call and revelation of SBM bribing Petrobras's employees, Petrobras's ADSs declined $0.62 per ADS or 6%, to close at $9.33 per ADS on November 17, 2014.

92.     Since the arrests, Brazilian Federal Police had obtained a confession from Fonseca that "he paid roughly 4 million Brazilian reais ($1.5 million) in bribes in order to win contracts from Petrobras." At least some of those contracts included projects at Petrobras's RNEST. As part of Fonseca's confession, he revealed to the Brazilian Federal Police that he met Costa and a congressman in a meeting in 2010. The congressman told Fonseca "that to be able to win contracts, he would have to pay." Another contractor who was arrested on November 14, 2014 had confessed that "he paid $19 million and $23 million in bribes to Renato Duque."

93.     On November 20, 2014, it was reported in various media outlets that a request was made to the Brazilian Prosecutor's Office in the Federal District and the Public Prosecutor at the Federal Audit Court for the immediate dismissal of Foster as the CEO of Petrobras and to establish a criminal inquiry into the matter. According to a news article, the request argued that Foster did not testify truthfully herself when she testified at a hearing on June 11, 2014 before a congressional investigation committee looking into the scandal, the Comissao Parlamentar de Inquerito. Specifically, Foster testified falsely that Petrobras didn't receive any warning from Netherland's authorities concerning bribery payments by SBM to Petrobras's employees.

94.     On November 24, 2014, a similar article in a Brazilian newspaper reported that at the June 11, 2014 hearing, Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by SBM. Foster answered that the

Company's internal committee "did not identify, within its activities and scope, payments of any

benefits to any of our employees." Next, Foster was asked whether Petrobras already knew about the

suspicion of bribery to Petrobras employees since 2012.43 Foster answered, "I do not confirm this

information."

95.     On the news of Foster's testimony to the Comissao Parlamentar de Inquerito,

Petrobras's ADSs declined $0.34 per ADS or 3%, to close at $10.50 per ADS on November 24,

2014

## SCIENTER ALLEGATIONS

96.     Costa who was a senior executive at the Company has been arrested on corruption

charges and placed in house arrest pending the criminal investigations by Brazilian authorities

for his; active participation in the money laundering and bribery scheme. Likewise, another

senior executive, Duque has been arrested on similar corruption charges for his active

participation in the money laundering and bribery scheme. Costa and Duque were senior officers

of Petrobras. Their knowledge of the fraud is attributable to the Company for purposes of

assessing the Company's scienter. Significantly, Foster was fully aware by May 27, 2014 that

SBM officials were bribing employees of Petrobras to guarantee winning certain contracts.

Foster's knowledge preceded her June 11, 2014 testimony to the CPI in which Foster testified

(falsely) that Petrobras did not receive any warning or notice from authorities in the Netherlands

that they were investigating bribery allegations with respect to SBM.

## LOSS CAUSATION

97.     During the Class Period, as detailed herein, Defendant engaged in a scheme to

deceive the market, and a course of conduct that artificially inflated the prices of Petrobras's

ADSs, which operated as a fraud or deceit on Class Period purchasers of Petrobras's ADSs by failing to disclose, and misrepresenting, the adverse facts detailed herein. When Defendant's prior misrepresentations and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of Petrobras's ADSs fell precipitously. As a result of their purchases of Petrobras's ADSs during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

98.     By failing to disclose to investors the adverse facts detailed herein, Defendant presented a misleading picture of Petrobras's business and prospects, financial position, and results of operations. Defendant's false and misleading statements caused Petrobras's ADSs to trade at artificially inflated levels throughout the Class Period.

99.     The decline in value of Petrobras's ADSs was a direct result of the nature and extent of Defendant's fraud finally being revealed to investors and the market. The timing and magnitude of the price decline of Petrobras's ADSs negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendant's fraudulent conduct. The economic loss, i.e.. damages, suffered by Plaintiff and the other Class members was a direct result of Defendant's fraudulent scheme and caused the subsequent significant decline in the value of Petrobras's ADSs when Defendant's prior misrepresentations and other fraudulent conduct were revealed.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

100.    The statutory safe harbor provided for forward-looking statements under certain circumstances under the Private Securities Litigation Reform Act of 1995 does not apply to any

of the allegedly false or misleading statements set forth in this Complaint. The statements alleged to be false or misleading herein relate to then-existing facts and conditions with respect to Petrobras Which were not fully, fairly, or adequately disclosed. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made, and there were no adequate, meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Cautionary language must truthfully address specific risks, must exhaust the capacity of the positive false statements to mislead investors^ and must disclose, as Defendant failed to do here, then existing adverse facts. Alternatively, to the extent that the statutory safe harbor is intended, to or does, apply to any forward-locking statements pleaded herein, Defendant is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendant had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendant failed to update those statements which later became inaccurate.

101.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

102.    Additionally, the safe harbor is statutorily inapplicable to the false, misleading, and incomplete annual financial statements of Petrobras since they were reportedly prepared in accordance with generally accepted accounting principles.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

103.    Plaintiff is entitled to a presumption of reliance because the claims asserted herein against Defendant is predicated, in part, upon false statements of material fact and/or the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, that Defendant had a duty to disclose.

104.    At all relevant times, market for Petrobras's ADSs was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's ADSs.

105.    The market for Petrobras's ADSs was efficient because, inter alia, throughout the Class Period: a. Petrobras's ADSs met the requirements for listing, and were listed arid,actively traded on the NYSE, a highly efficient and automated market; b. During the Class Period, there were approximately 768 million Petrobras's ADSs outstanding, millions of shares of Petrobras's ADSs were traded- on the NYSE; : with trading in excess of a million shares a day on the vast majority of days during the Class Period; c. As a regulated issuer, Petrobras filed periodic public reports with the SEC and the NYSE; d. Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as quarterly conference calls with investors, communications with the financial press and other similar reporting services, as well as presentations at various industry and market symposia and conferences; and e. Securities analysts followed and published research reports regarding Petrobras that were publicly available to investors. Each analyst wrote reports about

Petrobras that were distributed to the sales force and available to customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

106.    Throughout the Class Period, Petrobras was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the herein.

107.    Throughout the Class Period, Petrobras, directly or indirectly, engaged in a common plan, scheme and continuing course of conduct described herein, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Petrobras's ADSs.

108.    The purpose and effect of Petrobras's plan, scheme and course of conduct were to artificially inflate the price of Petrobras's ADSs and to artificially maintain the market price of Petrobras's ADSs.

109.    Petrobras had actual knowledge of the material omissions and/or the falsity of the material statements set forth above^ and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements made by it to members of the investing public, including Plaintiff and the Class, and the securities analysts.

110.    As a result of the foregoing, the market price of Petrobras's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Petrobras's statements concerning

the Company's financial statements and operations, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of Petrobras's ADSs during the Class Period in purchasing Petrobras's ADSs at prices which were artificially inflated as a result of the Defendant's false and misleading statements. 'Company's financial results and management to accurately present the Company's financial results. During this period, Petrobras continued to pump materially false and misleading information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's ADSs.

111.    As a result of the misconduct alleged herein (including Defendant's misstatements and omissions of material facts);-the market for Petrobras's ADSs was artificially inflated. Under such circumstances, the presumption of reliance available Under the "fraud-on-the market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions of material facts for which Defendant is responsible.

112.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's ADSs and were substantially damaged as a direct and proximate result of their purchases of Petrobras's ADSs at artificially inflated prices and the subsequent decline in the price of the ADSs when the truth was intermittently disclosed.

113.    The market for Petrobras's ADSs promptly digested current information regarding Petrobras from all publicly available sources and reflected such information in Petrobras's ADSs price. Under these circumstances, all purchasers of Petrobras's ADSs during the Class Period

suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## CLAIM FOR RELIEF

### Count I
### (Against Defendant)
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

114.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

115.   Petrobras's concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Petrobras's ADSs in ignorance of the financial risk to them as a result of such nondisclosures.

116.   As a result of the wrongful conduct alleged herein, when the truth concerning Petrobras's false statements and omissions was revealed to the investing public and the artificial inflation in the price of Petrobras's ADSs was, as a result, reduced and ultimately removed, in a series of corrective disclosures and/or the materialization of the concealed risks, Petrobras's ADSs price fell significantly and Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

117.   By reason of the foregoing, Petrobras has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and is liable to the Plaintiff and the other members of the Class for substantial damages that they suffered in connection with their purchase of Petrobras's ADSs during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Certifying Plaintiff as the "Class Representative" and his counsel as "Class Counsel";

C.      Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.      Awarding monetary damages against Defendant in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Granting prejudgment interest and such other and further relief as deemed appropriate by the Court.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: December 10, 2014                 Respectfully submitted,

                                         THE ROSEN LAW FIRM, P.A.

                                         Phillip Kim, Esq. (PK 9384)
                                         Email: pkim@rosenlegal.com
                                         Laurence Rosen, Esq. (LR 5733)
                                         Email: lrosen@rosenlegal.com
                                         275 Madison Avenue, 34th Floor
                                         New York, NY  10016

Phone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiff

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Petróleo Brasileiro S.A. - Petrobras. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Petróleo Brasileiro S.A. - Petrobras. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Ken
**Middle initial:**
**Last name:** Ngo
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 10/21/2014 | 500 | 12.96 |
| Common Stock | 11/13/2014 | 510 | 10.11 |
| Common Stock | 10/16/2014 | 500 | 14.4 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

**Certification for Ken Ngo (cont.)**

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 12/09/2014